NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13232

COMMONWEALTH  vs.  VAN LEON DORSEY, JR.


Hampden.     January 9, 2026. – July 30, 2026.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, & Dewar, JJ.


Homicide.  Controlled Substances.  Resisting Arrest.  Self-
    Defense.  Practice, Criminal, Assistance of counsel, New
    trial, Capital case.  Evidence, Self-defense, Expert
    opinion, Prior violent conduct, Prior misconduct.  Mental
    Health.



    Indictments found and returned in the Superior Court
Department on June 29, 2015.

    The cases were tried before John S. Ferrara, J., and a
motion for a new trial, filed on July 11, 2024, was heard by
David M. Hodge, J.


    Edward B. Gaffney for the defendant.
    David L. Sheppard-Brick, Assistant District Attorney, for
the Commonwealth.


    KAFKER, J.  A jury convicted the defendant, Van Leon

Dorsey, Jr., of murder in the first degree on the theory of

deliberate premeditation for the death of Monique Vanzant

(victim), who was fatally stabbed in the apartment where she and

the defendant lived. The defendant was also convicted of resisting arrest and possession of a class B substance. Represented by new counsel, the defendant filed a motion for a new trial, alleging ineffective assistance of counsel. The motion was denied. The appeal from the denial was consolidated with his direct appeal.

The defendant makes four claims of ineffective assistance of counsel, which he contends require a new trial. He claims that trial counsel unreasonably ended his investigation into the defendant's posttraumatic stress disorder (PTSD), which the defendant argues would have supported an additional substantial defense, or a finding, "at worst," of murder in the second degree. The defendant also argues counsel failed to adequately investigate the victim's violent history, which would have supported an Adjutant defense. See Commonwealth v. Adjutant, 443 Mass. 649 (2005). The defendant further claims that trial counsel failed to introduce evidence of the victim's drug usage immediately prior to her death and failed to introduce expert testimony on the defendant's defensive hand wound that would have further corroborated his testimony that he acted in self-defense. Finally, the defendant argues that we should reduce his conviction to murder in the second degree pursuant to G. L. c. 278, § 33E.

We discern no reversible error in our review of the defendant's direct appeal or his appeal from the denial of the postconviction motion for a new trial.  Having thoroughly examined the record, we also conclude that there is no reason to grant relief under G. L. c. 278, § 33E.  Thus, we affirm the defendant's convictions and the denial of his motion for a new trial.

1.  Background.  We begin by reciting the facts that the jury could have found and then summarize the evidence submitted in support of the defendant's motion for a new trial, reserving certain facts for later discussion.

a.  The Commonwealth's case at trial.  In May 2015, the defendant and the victim were dating and had been living together for several months in an apartment on the third floor of a three-story home in Springfield.  The victim had a five year old daughter with Corey Benjamin.  While the victim attended school to become a medical assistant, Corey's family -- including his sister, Sheterika Benjamin; Corey and Sheterika's mother, Sandra Turner; and Sandra's husband, Donald Turner -- would take care of the child.[1]  Sheterika lived at Sandra's house with her children, her nieces, and Sandra and Donald.

---

[1] Because Corey and Sheterika share a last name, and Sandra and Donald also share a last name, we refer to them by their first names.

At around 6:45 P.M. on May 12, 2015, while Sheterika was at home, the victim called Sheterika on her cell phone and they had a five-minute, light-hearted conversation. Sheterika could hear the defendant yelling in the background of the call and believed he sounded angry. After the call, Sheterika and Sandra began getting ready to bring the victim's daughter back to the victim and defendant's apartment. As they were in the car about to leave, Donald answered a telephone call from the victim on the home telephone line. The victim said, "I love you all," and then the line went quiet. Donald went outside and told Sandra about the victim's call, and Sandra went back inside the house to pick up the telephone. The call was still connected, but Sandra did not hear any sounds. She tried to call the victim back, but the calls went to voicemail.

Sheterika and Sandra then drove to the victim and defendant's apartment building, which took about five minutes. Sheterika continued to call the victim on the way, but her calls went to voicemail each time. Once they arrived, Sheterika found the victim's body lying inside the apartment building's entrance, which prevented the front door from opening completely. She tried to grab the victim's arm, but it slipped out of her grasp because it was covered in blood. Sandra called 911 while Sheterika stuck her head inside the doorway and called for the defendant. The defendant came down the stairs, but when

Sheterika asked him what he did, the defendant did not say anything. He then slammed the door closed with an angry expression, and Sheterika heard the defendant return upstairs.

Sheterika and Sandra waited on the porch of the apartment building until several police officers and first responders arrived at around 7:30 P.M. One first responder testified that he saw the defendant looking outside at the group through a third-story window, and he would periodically appear and disappear from view. A police officer eventually forced the apartment building's door open, and he observed the victim lying on the floor with no vital signs. The entryway floor was covered in blood. There were bloody footprints on the stairs leading away from the victim and bloodstains covering the stairs and walls leading up the staircase to the third-floor apartment. Inside the apartment, there were bloodstains in the living room and in the kitchen.

A forensic scientist at the State police crime laboratory collected blood samples from the scene of the crime. At trial, she opined that the spatter and "cast off" pattern of bloodstains throughout the front doorway area of the third-floor apartment and the staircase were consistent with blood being released from an object or a person in motion traveling downward, and that the bloodstains on the living room wall near

the front door were spatter stains consistent with blood being released from an object or a person in motion.

Two officers used the staircase at the back of the building to enter the third-floor apartment through an open door. They found the defendant lying face down on a couch with his hands under his body. Both the defendant and the couch were covered in blood. The officers repeatedly instructed the defendant to get on the floor and to show his hands, and after the fifth command to do so, the defendant slid off the couch and complied. The defendant struggled as the officers tried to handcuff him, and another officer entered the apartment through the front door and assisted. Pepper spray was deployed, and the officers eventually placed handcuffs and leg shackles on the defendant. The same forensic scientist also collected blood samples from the defendant at the scene of the crime.

In the apartment, officers found a broken knife handle and blade on the couch where the defendant was lying; the victim's Samsung cell phone underneath a couch cushion; and two small plastic bags containing phencyclidine, also known as PCP, on a built-in hutch in the living room.[2] There was also a partially

---

[2] The parties stipulated to the fact that both small plastic bags recovered from the apartment contained PCP.

opened box of knives in the kitchen sink and two burnt "blunts" on the kitchen table near the victim's notebooks.[3]

The officers eventually led the defendant, who was walking "on his own power," down the apartment building's back staircase. As the defendant descended the stairs, he repeatedly jerked his body away from the officer walking behind him. At the bottom of the stairs, an officer noticed that the defendant had a small cut on his hand and called for a paramedic to treat the wound. The defendant was cooperative while being treated and escorted to the police cruiser.

The defendant was thereafter transported to the Springfield police station. While a criminalist took sample swabs of the fluids and blood on the defendant's body, the defendant began to shake for about fifteen seconds. An officer testified that the defendant's behavior did not appear to be a seizure,[4] but the defendant was placed on his side into the recovery position as a precaution. Someone then called for an ambulance to transport the defendant to a hospital. While waiting for the ambulance, the defendant resumed behaving normally.

---

[3] Photographs of the notebooks, which included handwritten medical terms, were introduced at trial. The defendant does not dispute that these notebooks belonged to the victim.

[4] This officer also testified that he had received training on handling people who are having seizures and had witnessed several seizures in the past.

At the hospital, the defendant received a Glasgow Coma Scale score of eight, where a score of fifteen indicates a fully alert person.[5]  The defendant was administered various medical tests but was not diagnosed with having a seizure.  Prior to being discharged, the defendant had been lying down in the hospital for five to six hours without any unusual behaviors.  At the time of discharge, the defendant had a Glasgow Coma Scale score of fifteen.  When it was time to leave the hospital, the defendant complied with all police orders.  He then walked normally from the hospital room to the police car, which was about sixty yards.

Officers drove the defendant to the police station, which took about five minutes.  Upon arriving, the defendant no longer walked on his own and officers had to carry him into the booking area.  The defendant was informed that he was being audio and visually recorded.  Throughout the booking process, the defendant was hunched over, appearing unable to stand on his own.

---

[5] Dr. Alison Fife, a psychiatrist hired by the Commonwealth to evaluate the defendant, testified at trial that the Glasgow Coma Scale assesses eye movements, motor movements, and cognition to determine alertness.  The defendant's hospital records, which were admitted at trial, further note that at this time, the defendant had "vital signs . . . within normal limits" and was "resisting easily opening his eyes," but he would "not respond[] to verbal or stimuli [sic]".

The medical examiner, Dr. Katherine Lindstrom, performed the autopsy on the victim. She determined that the victim had suffered six sharp-force injuries that caused her death, including to her skull, neck, right hand, and forearm. The victim also had superficial stab wounds on her left arm, blunt force injuries to the left side of her face, and abrasions on her neck, left arm and left hand, and legs. Based on their color, the medical examiner testified that some of the abrasions appeared to have been inflicted after the victim's death, whereas others likely occurred before her death. The medical examiner opined that the incised wounds on the victim's right hand and forearm were consistent with defensive wounds, and the wound on the victim's skull would not have prevented her from speaking. The medical examiner also testified that she ordered a toxicology examination of the victim's body.

b. The defendant's case at trial. The defendant admitted to killing the victim, but trial counsel argued that the defendant acted in self-defense, albeit with excessive force, and was therefore guilty only of voluntary manslaughter. Trial counsel also argued that the defendant lacked the requisite intent for murder in the first degree because the defendant was under the influence of PCP.

The defendant's first witness was Dr. Alison Fife, a psychiatrist hired by the Commonwealth to evaluate the

defendant. Fife testified about the physiological effects of PCP, including mental disconnectedness, diminished impulse control, delusions, hallucinations, seizures, and aggression. She also testified that the defendant told her he frequently used PCP and had never grown violent as a result. She opined that the defendant had a diminished intelligence quotient but no major mental illness, that he may have feigned his seizure-like symptoms, and that he was able to appreciate the wrongfulness of his conduct at the time of the victim's death.

The defendant then testified on his own behalf. He explained that he began the day of the victim's death with a job interview and then eventually returned to his apartment. That evening, he and the victim were smoking marijuana and PCP together. At some point, the defendant received a telephone call from Stephanie Lopez, his ex-girlfriend and the mother of his child. He took the call in another room while the victim went into the kitchen. The defendant was upset by the call with Lopez, which concerned money for their child, but he testified that he was not angry. The victim then came out of the kitchen and was angry at the defendant because she believed he was cheating on her with Lopez. The defendant testified that in response, he began to leave the apartment when he suddenly looked over his shoulder and saw the victim standing with a knife in her hand. He then "grabbed her wrist and the knife at

the same time," and the two struggled throughout the apartment for control of the knife. The defendant eventually took the knife and, in a panic, stabbed the victim. He then stepped back, and the victim ran through the front door. After hearing a noise, he went downstairs and saw the victim lying there. The defendant testified that he did not remember anything else that happened until days later.

On cross-examination, the Commonwealth established that the defendant did not tell Fife that he was attacked by the victim or that he stabbed her in self-defense. Nor did he tell this to Dr. Robert Joss, who was hired by the defense. Rather, he told them he did not remember anything that occurred after his job interview.

c. Evidence presented in the defendant's motion for a new trial. In this consolidated appeal, the defendant raises four claims of ineffective assistance of counsel. First, he claims trial counsel failed to adequately investigate his PTSD, which would have supported the theory that he lacked the requisite intent for murder in the first degree based on the theory of premeditation. In his motion for a new trial, the defendant provided the opinion of Dr. Seth Pitman, who evaluated the defendant in April and May 2024, nine years after the victim's death. Pitman opined that at the time of the victim's death, the defendant was suffering from PTSD, which arose from a prior

incident in which the defendant was stabbed. As a result, the defendant was unable to discern reality, was in a compromised and reactive mental state, and acted in a highly emotional, impulsive manner.

The defendant's three remaining claims each relate to trial counsel's alleged failure to adequately investigate and argue his theory of self-defense and that the victim was the first aggressor. The defendant alleges trial counsel failed to adequately investigate the victim's history of violent conduct. His motion for a new trial included an affidavit from Lopez, who attested that she had a physical altercation with the victim in 2014 because the victim was jealous of Lopez's prior relationship with the defendant. Similarly, the defendant presented an affidavit from Alyssa Orwat, a mutual friend of the defendant and the victim, who stated that she witnessed at least one altercation between the defendant and the victim in which the victim was the aggressor. Additionally, the defendant himself provided an affidavit in which he attested to additional incidents of the victim's alleged violent conduct.

Next, the defendant contends trial counsel failed to introduce evidence that the victim was under the influence of PCP immediately before the attack. The defendant's motion provided evidence, which was available at the time of trial, that the victim had PCP in her bloodstream at the time of her

death and that the blunts found on the kitchen table next to the victim's notebooks contained marijuana and PCP.

Finally, the defendant claims trial counsel failed to introduce evidence corroborating the defendant's claim that the laceration on his palm was a defensive wound. The defendant provided the opinion of Dr. Richard Ma, a hospital-based physician and primary care provider with expertise in internal medicine, who examined photographs of the laceration on the defendant's hand and related medical records and opined that it was consistent with a defensive wound.

2. Procedural history. On June 29, 2015, the defendant was indicted on one count of murder in the first degree (count one); one count of resisting arrest (count two); one count of unlawful possession of PCP, a class B substance, as a subsequent offender (count three); and one count of cultivation of marijuana, a class D substance, as a subsequent offender (count four). A jury trial began on March 11, 2020, but resulted in a mistrial due to the COVID-19 pandemic.[6] On June 14, 2021, a second jury trial on the same charges began, with the defendant having new trial counsel. On June 21, 2021, the jury convicted

---

[6] The defendant was represented by different counsel at the first trial. Unless otherwise noted, references to "trial counsel" throughout this opinion refer to the defendant's lawyer at his second trial.

the defendant of murder in the first degree on a theory of premeditation, resisting arrest, and possession of PCP.[7] The judge sentenced the defendant to life imprisonment without the possibility of parole for the murder conviction and concurrent terms of one year in the house of correction for the convictions of resisting arrest and possession of PCP.

The defendant appealed from his convictions and subsequently filed a motion for a new trial. The motion judge, who was not the trial judge, denied the defendant's motion for a new trial after a nonevidentiary hearing. The defendant's appeal from that order was consolidated with his direct appeal before this court, pursuant to G. L. c. 278, § 33E.

3. Discussion. a. Standards of review. "Because the motion judge did not preside over the trial or conduct an evidentiary hearing," we review the denial of the motion for a new trial de novo. Commonwealth v. Mazza, 484 Mass. 539, 547 (2020). See Commonwealth v. Hernandez, 481 Mass. 189, 195, cert. denied, 589 U.S. 958 (2019) ("As the motion judge was not the trial judge, and as the motion judge conducted a nonevidentiary hearing, we are in 'as good a position as the

---

[7] The Commonwealth filed a nolle prosequi as to count four and so much of count three that alleged the defendant was a subsequent offender.

motion judge to assess the trial record'" [footnote and citation omitted]).

"In the review of cases involving murder in the first degree, '[r]ather than evaluating an ineffective assistance claim under the traditional standard of Commonwealth v. Saferian, 366 Mass. 89, 96 (1974), . . . we apply the standard of G. L. c. 278, § 33E, to determine whether there was a substantial likelihood of a miscarriage of justice'" (footnote and citation omitted). Commonwealth v. Kolenovic, 478 Mass. 189, 192-193 (2017). "Under this standard, 'we first ask whether defense counsel committed an error in the course of trial,' and if there was error, 'we ask whether it was likely to have influenced the jury's conclusion.'" Commonwealth v. Gibson, 492 Mass. 559, 568 (2023), quoting Commonwealth v. Ayala, 481 Mass. 46, 62 (2018). "[T]he defendant bears the burden of demonstrating both error and harm." Commonwealth v. Seino, 479 Mass. 463, 473 (2018). "Where a claim of error is based on a tactical or strategic decision by trial counsel, rather than an omission or mistake, an attorney's decision is only ineffective if it was manifestly unreasonable," that is to say, a decision that "lawyers of ordinary training and skill in criminal law would not consider competent" (quotation and citations omitted). Commonwealth v. Robinson, 493 Mass. 775, 789-790 (2024).

We address each of the defendant's four claims in turn.

b.  The defendant's potential PTSD.  Joss was hired by the defense prior to trial in 2017 to evaluate the defendant's mental state at the time of the victim's death.  Joss concluded that although the defendant had not been diagnosed with PTSD, "[t]here [was] evidence for a diagnosis of [PTSD]."  Trial counsel then hired Dr. Tammy Jones to interview the defendant regarding his PTSD.  Although Jones provided no written findings, trial counsel stated in his affidavit submitted with the motion for a new trial that, after meeting with Jones, "the conclusion had been that [the defendant] had never been officially diagnosed or treated for PTSD.  I then concluded that I would not be able to use PTSD in support of [the defendant's] defense at trial . . . ."  The defendant argues that trial counsel's decision not to continue investigating the defendant's PTSD was manifestly unreasonable because trial counsel already knew, based on Joss's findings, that the defendant did not have a PTSD diagnosis.  Thus, because the absence of a PTSD diagnosis does not indicate whether the defendant was suffering from PTSD at the time of the victim's death, the defendant claims that trial counsel prematurely abandoned his inquiry into the defendant's PTSD.

"Trial counsel must conduct a reasonable investigation into possible defenses, even if counsel ultimately does not pursue

those defenses at trial." Commonwealth v. Long, 476 Mass. 526, 532 (2017). "Absent a reasonable investigation, defense counsel lacks sufficient information to evaluate his or her strategic options and to make decisions in the best interests of the client." Commonwealth v. Diaz Perez, 484 Mass. 69, 74 (2020). "Where a defendant claims ineffective assistance of counsel on the ground that counsel's investigation was inadequate, the defendant 'must identify with particularity how any investigation that counsel failed to conduct would have benefited the defense.'" Commonwealth v. Noguera, 496 Mass. 601, 615 (2025), quoting Commonwealth v. Shepherd, 493 Mass. 512, 536-537 (2024).

We conclude that the defendant has failed to meet his burden to prove that trial counsel was ineffective on the ground of inadequate investigation of the defendant's PTSD. The record shows that counsel did engage an expert, Jones, specifically to inquire into the defendant's PTSD. Because Jones provided no written findings, the only information about Jones's conclusions is the two sentences in trial counsel's affidavit stating that Jones determined the defendant had not been diagnosed with PTSD, which led trial counsel to conclude that PTSD was not available to support the defendant's defense at trial. There are thus significant gaps in trial counsel's affidavit, because it is not clear what specifically Jones said for trial counsel to arrive

at that conclusion -- for example, whether Jones concluded only that the defendant had not been diagnosed with PTSD, merely repeating what trial counsel already knew from Joss's findings, or whether Jones opined on whether the defendant actually had PTSD.[8]  "Speculation, without more, is not a sufficient basis to establish ineffective representation."  Shepherd, 493 Mass. at 537, quoting Commonwealth v. Duran, 435 Mass. 97, 103 (2001).  "Moreover, where trial counsel submitted his own affidavit, trial counsel's failure to confirm [certain] points speaks volumes.  When weighing the adequacy of the materials submitted in support of a motion for a new trial, the judge may take into account the suspicious failure to provide pertinent information from an expected and available source."  Commonwealth v. Goodreau, 442 Mass. 341, 354 (2004).[9]

---

[8] The defendant avers in his affidavit submitted with his motion for a new trial that Jones did not evaluate him to determine whether he had PTSD and instead asked him only whether he had been diagnosed and treated for PTSD.  But "[a] judge is not required to accept as true the allegations in a defendant's affidavit, even if nothing in the record directly disputes them."  Commonwealth v. Freeman, 442 Mass. 779, 792 n.14 (2004), quoting Commonwealth v. Rzepphiewski, 431 Mass. 48, 55 (2000).

[9] We also note that Pitman's report has its own weaknesses.  Although Pitman opined that the defendant was suffering from PTSD at the time of the killing and was unable to discern reality, his report acknowledges that the defendant provided him with more detail about the killing than the defendant provided to any of the previous experts.  Additionally, even Pitman, like Fife, opined that the defendant was likely feigning and exaggerating some of his symptoms.

Furthermore, other information in the record supports a conclusion that the decision to forgo further investigation of the PTSD defense was not unreasonable. See Commonwealth v. Tavares, 491 Mass. 362, 366 (2023) ("counsel need not descend into every rabbit hole"). The defendant's own expert, Joss, concluded that although the defendant showed signs of PTSD, the defendant's actions were "likely due to the use of both marijuana and PCP which resulted in a temporary psychosis." Accordingly, trial counsel introduced expert testimony and argued that the defendant was incapable of forming "the intent to kill required for murder in the first degree under the theory of deliberate premeditation," Commonwealth v. Doughty, 491 Mass. 788, 800 (2023), or "in relation to whether the defendant committed the killing with extreme atrocity or cruelty" on this alternative basis of the defendant's PCP consumption (quotation omitted), id. at 803.[10] Indeed, trial counsel elicited testimony from Fife, the Commonwealth's own expert, that PCP can cause delusions, hallucinations, seizures, and aggressive behavior, and can reduce impulse control.[11]

---

[10] The jury did not convict the defendant of murder in the first degree on a theory of extreme atrocity or cruelty.

[11] However, Fife also concluded that the defendant did not have a major mental illness and that he was able to appreciate the wrongfulness of his conduct at the time of the victim's death.

In sum, the defendant has failed to prove that trial counsel was ineffective for failing to conduct an adequate investigation of the defendant's PTSD.

c. The victim's history of violent conduct. The defendant next contends that trial counsel's investigation of the victim's history of violent conduct was also inadequate and prejudiced his self-defense claim. Under Adjutant, 443 Mass. at 664, "where the identity of the first aggressor is in dispute and the victim has a history of violence . . . , the trial judge has the discretion to admit evidence of specific acts of prior violent conduct that the victim is reasonably alleged to have initiated, to support the defendant's claim of self-defense." In his affidavit, trial counsel avers that although he looked for "so-called Adjutant evidence" in the victim's criminal record, he "did not see anything that [he] felt would be admissible" and thus the jury did not hear any such evidence at trial. The defendant argues that because Adjutant does not require that prior violent conduct result in criminal charges in order to be admissible, and given the importance of evidence corroborating his self-defense claim, it was manifestly unreasonable for trial counsel to limit his investigation for Adjutant evidence to the victim's formal criminal record. In the defendant's view, such a decision was particularly unreasonable because during the defendant's first trial, which ended in a mistrial due to the

COVID-19 pandemic, Sheterika testified that she and the victim had a fist fight sometime prior to the killing. Trial counsel was therefore on notice that potential Adjutant evidence existed outside of the victim's criminal record.[12]

Even assuming that trial counsel's investigation was inadequate for the reasons offered by the defendant, the defendant has not shown that any such shortfall created a substantial likelihood of a miscarriage of justice. See Noguera, 496 Mass. at 616. First, it is not clear that trial counsel would have presented evidence of the alleged prior incidents of violence even after a more fulsome investigation. See id. at 617 (defendant's argument that deficient investigation resulted in substantial likelihood of miscarriage of justice "rests on speculation, because the defendant has not shown that counsel would have introduced these records in evidence at trial even if he had obtained them"). In his affidavit, trial counsel stated that he chose not to present Adjutant evidence in part because he "felt strategically it may not be beneficial in the eyes of the jury." Any strategic reasons trial counsel had for not offering evidence of prior

---

[12] The defendant also stated in his affidavit that he had alerted trial counsel to several instances of the victim attacking him and others. However, Joss's evaluation states that the defendant reported that he had not had any "fights or verbal arguments" with the victim.

violent acts from the victim's criminal record would reasonably apply with even greater force to the incidents highlighted in the defendant's motion for a new trial, as these incidents are uncorroborated by police reports or other official records.

Moreover, each of the violent acts described in the defendant's motion suffers from significant weaknesses. For example, both Orwat's and Lopez's credibility are undermined by the fact that they have close relationships with the defendant, and they did not come forward with their allegations of the victim's violent conduct until after the defendant had been held before trial for several years and was eventually convicted. See Commonwealth v. Washington, 459 Mass. 32, 41 (2011), quoting Commonwealth v. Hart, 455 Mass. 230, 238 (2009) (although "'[a] person ordinarily has no legal obligation to provide exculpatory information to the police,' . . . a witness's failure to do so may support 'a reasonable inference that the exculpatory information is not credible'" [citation omitted]). Further, despite averring in her affidavit that she "never throw[s] the first punch" and thus the victim likely instigated their physical fight in 2014, Lopez's criminal record describes an incident in which she was accused of initiating a fist fight at a bar. Orwat also has several serious felony convictions. See Commonwealth v. Smith, 450 Mass. 395, 407, cert. denied, 555 U.S. 893 (2008) ("Under G. L. c. 233, § 21, evidence of a

witness's prior convictions may be used to impeach the witness's credibility if the convictions meet the requirements of that section, [and] convictions relevant to credibility are not limited to crimes involving dishonesty or false statements"). Regarding the violent conflict between the victim and Sheterika, the defendant's motion contains no evidence that the victim was the first aggressor. See Adjutant, 443 Mass. at 664 (judge has discretion to admit evidence of violent acts "that the victim is reasonably alleged to have initiated" [emphasis added]). And because Corey did not submit an affidavit about the victim's violent conduct toward him during their relationship, the only support for each of the remaining allegations comes from the defendant's self-serving affidavit.

Finally, even if trial counsel had proffered and the trial judge had admitted such evidence despite the foregoing, it is nevertheless unlikely that this evidence would have influenced the jury's verdict. See Noguera, 496 Mass. at 622, citing Gibson, 492 Mass. at 568. We agree with the Commonwealth's view that it is a stretch to suggest that because the victim had previously engaged in fist fights, she would have attacked the defendant with a large kitchen knife. Although each of the alleged incidents provide some limited support for the defendant's claim that the victim was the first aggressor, slapping, punching, and scratching are markedly different from

threatening someone with a deadly weapon. Cf. Commonwealth v. Deconinck, 480 Mass. 254, 267 (2018) (judge did not abuse discretion in finding that violation of restraining order was not probative of victim's aggression and use of knife against defendant). Ultimately, the defendant's self-defense claim required that the jury credit his testimony; but the jury also heard testimony, from both Fife and the defendant himself, that the defendant's story had changed several times since the killing. His failure to tell either Fife or Joss, the latter being the defense's own expert, that he was attacked by the victim and had to defend himself significantly undercuts the credibility of his self-defense claim. Furthermore, the physical blood spatter evidence and the wound on the right side of the victim's neck were consistent with the Commonwealth's theory that the defendant stabbed the victim as she attempted to flee from the apartment. We therefore conclude that any inadequate investigation or other errors by trial counsel relating to this Adjutant evidence did not create a substantial likelihood of a miscarriage of justice. See Gibson, supra. Accordingly, the defendant's motion for a new trial was properly denied on this ground.

d. The victim's drug usage. Next, the defendant argues that trial counsel was ineffective for failing to introduce evidence that the victim was under the influence of PCP

immediately before her death, particularly because PCP can cause increased aggressive behavior. We reject this argument because (1) this evidence was duplicative of evidence presented at trial, and (2) any additional evidence that PCP consumption could have caused the victim to act violently could have been used by the Commonwealth to suggest that the defendant, too, would have been more likely to act violently.[13]

More specifically, there was ample evidence introduced at trial of both the victim's and the defendant's PCP usage: there was evidence of PCP and marijuana in the apartment, including photographs of two burnt blunts on the kitchen table near the victim's notebooks; testimony of the crime scene officer, Sergeant James McCoy, that the burnt blunts were consistent with those containing narcotics; and testimony of the defendant that both he and the victim used PCP on the evening of the victim's death. Additionally, Fife specifically testified that PCP can cause aggressive behavior. Trial counsel's decision not to belabor the victim's PCP usage to suggest that she was the first aggressor was thus not manifestly unreasonable because, as the motion judge noted, the evidence cuts both ways: the jury could

_____

[13] Trial counsel's affidavit on this issue states only that "[e]vidence of both parties' use of PCP came into evidence through [the defendant's] testimony as well as testimony from the officers who responded on scene."

equally have inferred from the defendant's PCP usage that he was the first aggressor. See Robinson, 493 Mass. at 791-792 (decision not to call expert not manifestly unreasonable where expert's testimony could have "cut both ways" by undermining other witnesses' testimony); Commonwealth v. Kirkland, 491 Mass. 339, 356 (2023) (counsel not ineffective where expert testimony "had the potential to be a double-edged sword for the defense, potentially helping the defendant's case on the one hand but hurting it on the other"); Commonwealth v. Teixeira, 486 Mass. 617, 638 (2021) (counsel's decision not to call witness not manifestly unreasonable "[s]ince the witness's testimony at best would have been a double-edged sword"). We therefore discern no error by trial counsel.

e. The defendant's hand wound. Finally, we address the defendant's assertion that his trial counsel was ineffective for failing to introduce expert testimony that the laceration on his hand was consistent with a defensive wound. The defendant contends that this failure was prejudicial because it deprived him of critical corroboration of the only physical evidence supporting his self-defense claim. In support of this argument, the defendant submitted a report from Ma, a physician who the defendant claims has "expertise in identifying and treating defensive wounds made with sharp instruments such as knives." In his report, Ma opined that the injury on the defendant's

"right palm [was] consistent with a defensive wound" and inconsistent with the Commonwealth's theory at the trial, which was that the defendant injured himself when he lost grip of the knife while attacking the victim.

We note at the outset that the proffer to establish Ma's credentials as an expert on defensive wounds was weak at best. Although the record before us demonstrates that Ma worked as a hospital-based physician and primary care provider for many years, apart from conclusory statements in Ma's report and appellate counsel's affidavit,[14] there is little indication that Ma had any experience or training in the area of forensic pathology generally or defensive wounds specifically. Contrast Commonwealth v. Cyr, 425 Mass. 89, 96-97 (1997), S.C., 433 Mass. 617 (2001) (medical examiner qualified to opine on whether injuries were defensive wounds because he "based his opinion on his specialized training" and "his extensive experience in having conducted approximately 3,000 autopsies").

---

[14] For example, appellate counsel avers in an affidavit submitted with the defendant's motion that in the course of counsel's work with Ma, "he confirmed to [counsel] that he is a physician with expertise in identifying and treating wounds made with sharp instruments (such as knives), including defensive wounds." Likewise, in Ma's report, he states that he has "the scope of licensure or certification that typically manages the medical condition, procedure, treatment, or experience to render an opinion for this case."

Even assuming Ma was qualified to opine as he did, we do not think any related error "was likely to have influenced the jury's conclusion" (citation omitted). Kirkland, 491 Mass. at 346. The evidence at trial indicated that the defendant brutally attacked the victim and inflicted six sharp-force injuries, while the laceration on his hand was relatively minor.[15] Moreover, trial counsel was able to elicit testimony from the paramedic who treated the defendant at the scene about the location and nature of the injury, and counsel highlighted the injury for the jury in his closing argument. Although expert testimony on this issue might have helpfully bolstered the defendant's narrative of the killing, "[t]here is no requirement that trial counsel always present expert . . . evidence to support an argument, especially where other evidence is presented to support it." Commonwealth v. Hensley, 454 Mass. 721, 736 (2009). We therefore conclude that the motion judge did not err in denying the motion for a new trial on this issue.[16]

---

[15] The defendant's hospital records describe the injury as "a small linear laceration on the right palmar aspect of the hand."

[16] The defendant also suggests that trial counsel was ineffective for not taking full advantage of prior testimony from the paramedic who treated the defendant. On cross-examination, trial counsel established that the paramedic had testified at the defendant's first trial that he observed multiple "lacerations" on both of the defendant's hands.

f.  Review under G. L. c. 278, § 33E.  The defendant seeks a reduction in the murder verdict to a lesser degree of guilt pursuant to our power under G. L. c. 278, § 33E.  The evidence in this case suggested that the defendant retrieved a knife from the kitchen and repeatedly stabbed the victim and chased her down the stairs as she tried to flee the apartment.  This evidence amply supports the defendant's conviction of murder in the first degree on a theory of premeditation.  See Commonwealth v. Guy, 441 Mass. 96, 102 (2004) ("there was evidence that the defendant deliberately selected a knife from his collection of knives to use on the victim. . . .  This choice, as well as his pursuit of the fleeing, wounded victim, supports the jury's finding of deliberate premeditation"); Commonwealth v. Watkins, 373 Mass. 849, 852 (1977) ("evidence that the defendant, after a quarrel, went to the kitchen, picked up a knife and returned to stab the victim is sufficient [for finding deliberate

---

Because trial counsel indicated that he intended to rely on this prior testimony, the trial judge stated at the charge conference that he would not give a limiting instruction on prior inconsistent statements.  However, the trial judge did give this limiting instruction, and trial counsel did not object.  We reject this argument for substantially the same reasons described supra.  In light of the victim's significant injuries, evidence that the defendant had multiple lacerations on his hands rather than a single minor laceration would not have made a difference to the jury.  We also note that the defendant's hospital records state that there was "[n]o evidence of trauma" except a single laceration on his palm.

premeditation]").  In light of the entirety of the record, we discern no basis to reduce the verdict of murder in the first degree.

4.  <u>Conclusion</u>.  For the foregoing reasons, we affirm the judgments and the order denying the defendant's motion for a new trial.

<u>So ordered</u>.